## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| Randall A. Otto, | : | |
| Plaintiff, | : | |
| | : | Case No. 3:20-cv-00060-TPK |
| vs. | : | |
| Andrew Saul, | : | Magistrate Judge Kemp |
| Commissioner of | | |
| Social Security, | : | |
| Defendant. | : | |

## OPINION AND ORDER

Plaintiff Randall A. Otto filed this action seeking review of a final decision of the Commissioner of Social Security.  That decision, issued by the Appeals Council on December 18, 2019, denied his applications for social security disability benefits and supplemental security income.  Plaintiff filed a statement of errors on June 29, 2020 (Doc. 11) to which the Commissioner responded on September 10, 2020 (Doc. 14).  The parties have consented to final disposition of this case by a United States Magistrate Judge.  For the following reasons, the Court will **SUSTAIN** the statement of errors and **REMAND** this case to the Commissioner under the 42 U.S.C. § 405(g), sentence four, for an immediate award of benefits.

## I.  INTRODUCTION

Plaintiff protectively filed his applications on January 22, 2016 and March 4, 2016, respectively, alleging that he became disabled on August 4, 2015.  After initial administrative denials of his claim, Plaintiff appeared at a hearing held before an Administrative Law Judge on July 25, 2018.  A vocational expert, Karen Schneider, also testified at the hearing.

The Administrative Law Judge issued an unfavorable decision on January 2, 2019. In that decision, she first found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2020, and that he had not engaged in substantial gainful activity since the alleged onset date.  The ALJ next concluded that Plaintiff suffered from severe impairments including degenerative disc disease of the lumbar spine, moderate spinal canal stenosis of the thoracic spine, mild disc herniation of the cervical spine, acromioclavicular joint separation with minimal degenerative joint disease of the right shoulder, morbid obesity, mixed anxiety and depressive disorder, depressive disorder, and alcohol and drug substance abuse disorders. However, the ALJ also found that none of these impairments, taken singly or in combination, met the criteria for disability found in the Listing of Impairments.

Moving to the next step of the sequential evaluation process, the ALJ found that Plaintiff could perform a reduced range of light work. She concluded that Plaintiff could carry out the exertional demands of light work but could only push or pull and reach overhead occasionally with his arms. He could frequently stoop and crouch but crawl only occasionally. He could not work at unprotected heights or around dangerous machinery and could do no occupational driving. From a mental standpoint, Plaintiff could perform one- to four-step tasks with occasional interaction with coworkers but no shared or tandem tasks, with occasional interaction with the public but not in a customer service capacity, and with occasional interaction with supervisors but not with over-the-shoulder supervision. He could adapt to normal changes in the workplace but might need to receive advance notice of any major changes.

The ALJ determined that with these limitations, Plaintiff could not perform his past relevant work as a fast food worker or management trainee. At the hearing, the vocational expert testified that someone with the residual functional capacity determined by the ALJ could do certain light jobs including mail clerk, merchandise marker, and housekeeping cleaner. The ALJ accepted this testimony as well as the testimony that these jobs exist in significant numbers in the national economy. As a result, she concluded that Plaintiff was not disabled within the meaning of the Social Security Act.

In his statement of errors, Plaintiff raises four separate issues. He argues generally that the ALJ's decision is not supported by substantial evidence and then, in his other three assignments of error, contends that the ALJ erred in her weighing of the opinion evidence from treating sources Drs. Linn and Bishop and gave undue weight to the opinions of the state agency reviewers; made unreasonable and unsupportable evidentiary findings; and did not properly accept testimony about disability from the vocational expert involving Plaintiff's inability to accept over-the-shoulder supervision during any probationary period.

## II. STANDARD OF REVIEW

As this Court said in *Jeter v. Comm'r of Soc. Sec. Admin.*, 2020 WL 5587115, at *1–2 (S.D. Ohio Sept. 18, 2020)**,**

> Judicial review of an ALJ's non-disability decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met—that is, "if a 'reasonable mind might accept the relevant evidence as adequate to

support a conclusion.' " *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.,* 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance...." *Rogers*, 486 F.3d at 241 (citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal criteria—may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.' " *Rabbers,* 582 F.3d at 651 [quotations and citations omitted].

## III.  FACTUAL BACKGROUND

The Court will begin its review of the factual background of this case by summarizing the testimony given at the administrative hearing.  It will then recite the pertinent information found in the medical records.

Plaintiff, who was 39 years old at the time of the hearing, first testified that he lived with his father and mother as well as one of his brothers.  He had no education beyond high school.  He drove about three times per week taking his son to football practice.  His last job was working at a Taco Bell restaurant, first as a crew member and then as a manager.

At age 21, Plaintiff was diagnosed with bipolar disorder.  He had been taking medication on and off since then but sometimes did not have insurance to cover the cost.  Plaintiff stopped working in August of 2015 due to a prolonged manic episode which caused him to be jailed and to make threats against people, ultimately resulting in his being fired.  Before that, he had injured his back at work, and received treatment in the form of physical therapy and injections.  In 2017 he attempted suicide and was also jailed for threats against the mother of his children.

Plaintiff testified that he was able to do various household activities including helping with cooking and cleaning but that he needed breaks to do so.  He also helped care for the family pets.  Occasionally he had issues with his family members, and he also suffered bouts of depression on a weekly basis.  Finally, he said he had anxiety issues as well and took medication for that condition although it did not always help.

The vocational expert, Ms. Schneider, classified Plaintiff's past work as a fast food worker and management trainee as light and either unskilled or skilled.  She was then asked questions about a person who had the residual functional capacity to do a reduced range of light

work as determined by the ALJ (including no tolerance for over-the-shoulder supervision), and said that such a person could not do Plaintiff's past work. The person could, however, do jobs like mail clerk, merchandise marker, and housekeeping cleaner, and she gave numbers for those jobs as they existed in the national economy. If the person could use his or her dominant hand only occasionally, that person could not work.

Ms. Schneider was then asked a series of questions about over-the-shoulder supervision. She testified that in order to do the jobs she identified, there would be some of that type of supervision during any probationary period, but not once the person had learned the job. If the person had zero tolerance for over-the-shoulder supervision, Ms. Schneider said that in her opinion such a person could not complete the required probationary period. Other factors which would completely rule out employment included the need to work in complete isolation, missing work twice per month, being off task more than 15% of the time, needing to take breaks on a flexible schedule, and making threats of violence against coworkers.

Because, as more fully discussed below, the Court finds that the ALJ's failure to accept the vocational testimony regarding probationary periods to be dispositive, the Court will summarize the medical evidence only briefly. Much of it deals with Plaintiff's psychological condition.

Plaintiff was seen in the Emergency Room of Grandview Hospital on August 4, 2015, after getting aggressive with his counselor. His medical history included diagnoses of bipolar disorder and anxiety. He was described as slightly agitated but did not need hospitalization. Later that same year he was treated at Samaritan Behavioral Health, Inc., appearing with hyperactivity and rapid and pressured speech as well as paranoid and religious delusions. He also appeared impaired in his attention, concentration, and memory. His primary diagnosis was bipolar disorder I but there was also a diagnosis of anxiety. He engaged in a short term of treatment with that provider before transferring to Mahajan Therapeutics, a provider closer to his home. His family physician, Dr. Linn, also provided medication for his psychiatric conditions during this time, including Seroquel and Xanax, and treated him for various physical conditions as well including back pain accompanied by numbness, weakness, and other abnormalities including a restricted range of motion. These symptoms led to a referral for pain management as well as to an unsuccessful course of physical therapy.

Plaintiff reported numerous psychiatric symptoms in 2015 and 2016 including manic episodes, crying spells, depressed mood, lethargy, anxiety, aggression, and anger as well as difficulty sleeping, and Dr. Linn consistently reported that Plaintiff seemed anxious. In 2016, Plaintiff became a patient at Reach Out of Montgomery County. He continued to report symptoms of sleeping difficulties and anxiety and continued to receive medication for bipolar disorder.

Throughout 2107 and 2018, Dr. Linn's office notes consistently refer to Plaintiff as being positive for a dysphoric mood, sleep disturbance, and being nervous and anxious, and they also

-4-

document additional treatment for Plaintiff's various physical ailments. In 2018, Dr. Linn filled out a medical impairment questionnaire noting that Plaintiff's symptoms consisted of severe back pain and right shoulder pain. Dr. Linn thought Plaintiff could stand and sit for only thirty minutes at a time and could work for only two hours per day. Other limitations were described as well, and he opined that Plaintiff would be off task more than 20% of the time and miss work three times per month. (Tr. 1003-04). He had previously told the Ohio Department of Job and Family Services that Plaintiff was unemployable due to both physical and mental impairments.

Dr. Bishop, a psychiatrist, began seeing Plaintiff for medication management n 2015. In a note dated January 4, 2017, he reported that Plaintiff was doing reasonably well and that he had not had any significant manic episodes. He did have a manic episode in March of that year which could have been caused by alcohol consumption. The most frequently mentioned symptom was insomnia, but Plaintiff was experiencing sleep apnea and also was practicing poor sleep hygiene. Dr. Bishop completed a questionnaire in September, 2017, indicating that he had been treating Plaintiff for almost two years and that Plaintiff suffered from a severe mood disturbance characterized by poor memory, sleep and mood disturbance, social withdrawal, emotional lability, illogical thinking, decreased energy, manic syndrom, recurrent panic attacks, loss of interest, and difficulty thinking or concentrating. He thought Plaintiff would be off task 20% or more during a workday and would miss work more than three times per month. Dr. Bishop also rated the level of Plaintiff's impairment as either "marked" or "extreme" in all work-related areas of functioning. (Tr. 666-68). Dr. Bishop's notes from 2018 show that Plaintiff had another manic episode that year but that otherwise his mood was stable, his medications were working well, and his sleep was better. Dr. Bishop had also told the Department of Job and Family Services that Plaintiff could not work.

Dr. Bonds performed a consultative psychological evaluation of Plaintiff on June 14, 2016. Plaintiff explained that his disability application was based on depression, anxiety, difficulty sleeping, back pain, and bipolar disorder and that he had difficulty concentrating and memory problems. He told Dr. Bonds that he was seeing Dr. Bishop at Mahajan Therapeutics for anger management therapy. Plaintiff appeared "anxious and tense" during the interview but demonstrated adequate insight and understanding. Dr. Bonds rated Plaintiff's GAF at 50 and said that Plaintiff was able to read and understand written instructions, that he had satisfactory attention and concentration during the interview (although he reported interference with these abilities when he experienced mood swings), that although he was cooperative during the evaluation he also reported problems controlling his temper, and that his "ability to handle work pressures is limited because of his low frustration tolerance and poor emotional controls." (Tr. 526-33).

The state agency reviewers reached the following conclusions. Drs. Klyop and Manos both thought that, physically, Plaintiff could do light work but was limited in his ability to push or pull with his right arm or to reach with it overhead and that he had some slight postural restrictions. Dr. Kirwin, a psychologist, concluded that Plaintiff could understand, remember, and carry out one- to four-step work tasks and that he was moderately limited in his ability to

maintain attention and concentration for extended periods, restricting him to the performance of tasks without high pace or high production quotas.  Dr. Kirwin also noted that Plaintiff had some moderate limitations in his ability to interact with others, including supervisors, coworkers, and the general public.  Dr. Baker, a second psychologist, thought that Plaintiff might need occasional flexibility with breaks when he experienced increased symptoms and also that he could have occasional and superficial contact with supervisors, coworkers, and the general public, with the caveat that supervisors should provide constructive feedback.  Plaintiff would also need advance notice of major workplace changes and time to adjust to them.  Dr. Baker also indicated that the consultative examiner's opinion was "an overestimate fo the severity of [Plaintiff's] restrictions/limitations" because it was based on Plaintiff's subjective report and symptoms and was inconsistent with other evidence.  (Tr. 126).

## IV.  DISCUSSION

The third claim raised in Plaintiff's statement of errors rests on the vocational expert's testimony about the effect of being unable to tolerate over-the-shoulder supervision.  As noted above in the summary of the testimony given at the administrative hearing, the expert said that such supervision necessarily occurs during the probationary period of the jobs she identified and that a person's inability to adapt to such supervision would preclude the person from completing any probationary period successfully.  According to the Commissioner, however, this testimony is "irrelevant to Plaintiff's RFC" because the residual functional capacity finding describes what a claimant can do on a sustained basis rather than during a short probationary period and that to find otherwise would ignore the 12-month durational requirement for disability found in 42 U.S.C. §423(d)(1)(A).  The Court will address this claim first because it is dispositive of the issue of remand.

It appears that the Commissioner has unsuccessfully advanced similar arguments in the past when this issue has arisen.  A comprehensive analysis of the question can be found in the Court of Appeals for the Second Circuit's decision in *Sczepanski v. Saul*, 946 F.3d 152 (2d Cir. 2020).  There, the ALJ found that the claimant would potentially need to be absent from work one day per month.  The vocational expert identified three unskilled jobs which the claimant could do, but testified that during a 90- to 120-day probationary period for these jobs, no absenteeism would be tolerated.  The ALJ concluded that this testimony was irrelevant because the key issue was whether the claimant could "do the job."  The District Court affirmed the Commissioner's decision, reasoning that the ability to complete a probationary period was an "outside factor" and not pertinent to the claimant's ability to sustain substantial gainful employment.  *See Sczepanski v. Colvin*, 2019 WL 210842, *3 (W.D.N.Y. Jan. 15, 2019).

The Court of Appeals reversed.  It acknowledged that it was the first Court of Appeals to address the question of whether the inability to complete a probationary period required a finding that a claimant could not do substantial gainful activity, but noted that "[m]ultiple district courts have passed on the question ... and nearly all have answered it in the affirmative."  *See Sczepanski v. Saul*, 946 F.3d 152, 158 (2d Cir. 2020), citing to district court decisions from

Florida, Indiana, Oregon, Iowa, and, interestingly, from this Court. *Id*. at n.6. The Court of Appeals specifically rejected the Commissioner's claim that probationary periods are irrelevant to the question, reasoning that "the ability to keep a job is a necessary prerequisite to the ability to engage in substantial gainful activity." *Id*. at 159. It also declined to accept the Commissioner's arguments that "hiring practices" are irrelevant to this question, noting that the need to complete a probationary period was not a hiring practice. The Court of Appeals also did not agree with the Commissioner that the relevant legislative history (which the Court analyzed in some detail) counseled in favor of a different result.

The case from this Court cited in *Sczepanski* is Judge Newman's decision in *McLaughlin v. Comm'r of Soc. Sec.*, 2019 WL 125761 (S.D. Ohio Jan. 8, 2019), *report and recommendation adopted*, 2019 WL 1902749 (S.D. Ohio Apr. 29, 2019). *McLaughlin* did not actually decide the question because the Commissioner had conceded error and had moved for remand. As a result, the issue presented in that case was only whether a remand was necessary to resolve inconsistencies in the evidence, or whether an immediate award of benefits should be ordered. As more fully discussed below, the Court chose the latter option. Later, however, in *McAfee v. Comm'r of Soc. Sec.*, 2020 WL 5810004 (September 30, 2020), Judge Newman resolved this question in favor of the claimant (who, like Plaintiff here, was deemed to be unable to tolerate over-the-shoulder supervision), and he remanded that case for an award of benefits as well. Thus, this Court is on record as having rejected the exact argument advanced by the Commissioner in this case, although, to be fair, the Commissioner's memorandum was filed in this case twenty days before Judge Newman's decision in *McAfee* was issued. Nevertheless, this Court does not write on a clean slate.

The Court finds the reasoning and results of *Sczepanski* and *McAfee* to be persuasive. The successful completion of a probationary period is one of many requirements of substantial gainful employment, and the Court sees no reason to treat it differently from any other job requirement which a person seeking to retain employment must be able to perform within the limits of his or her residual functional capacity. Consequently, the Court concludes that the Commissioner did not meet his burden at step five of the sequential evaluation process of demonstrating that there were jobs in the national economy which Plaintiff was capable of performing.

Although the Commissioner's memorandum does not offer this justification for the error, the ALJ did attempt to undercut for this conclusion by reasoning that "there is nothing in the record to suggest that the claimant is unable to complete a probationary period" because Plaintiff "was ... able to work as a crew member for over seven years, demonstrating an ability to control his behaviors during probationary periods," *see* Tr. 34. That statement, however, is not based on substantial evidence. There was no testimony that any of Plaintiff's past work required a probationary period; no evidence that during such a period over-the-shoulder supervision was involved; and no evidence, that, if there had been a probationary period, Plaintiff was, at that time, psychologically unable to accept over-the-shoulder supervision. Further, that statement directly conflicts with the earlier finding made by the ALJ that Plaintiff's residual functional

capacity did not include the ability to tolerate any over-the-shoulder supervision. The ALJ therefore committed error, and the question then becomes whether to remand the case for an award of benefits, as was done in *McLaughlin* and *McAfee*, or to remand for further consideration.

This Court has previously set forth the standard for determining the nature of the remand to be ordered. As the Court said in *Masters v. Comm'r of Soc. Sec.*, 382 F. Supp. 3d 726, 734 (S.D. Ohio 2019),

> The Court has authority to affirm, modify or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. § 405(g); *Melkonyan v. Sullivan*, 501 U.S. 89, 100, 111 S.Ct. 2157, 115 L.Ed.2d 78 (1991). Generally, benefits may be awarded immediately "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994); *see also Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990); *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 782 (6th Cir. 1987).

Some courts which dealt with the same vocational issue raised here chose to remand the case for further proceedings rather than to award benefits. For example, in *Bernard L. v. Saul*, 2020 WL 7027637, *6 (N.D. Ill. Nov. 30, 2020), the court opted for remand because "the VE did not testify whether the jobs at issue were, in fact, entry-level or required a probationary period," thus creating an inconsistency that could be addressed on remand. Similarly, in *Sczepanski*, the Court noted that the vocational expert had identified nearly three million jobs that the claimant could perform were he not required to miss one day of work per month, and the record was unclear as to whether a significant portion of those jobs either did not have probationary periods or permitted absences during those periods.

Here, however, the testimony given on this issue was clear. The vocational expert did not (as occurred in *Sczepanski)* testify that there were a large universe of jobs which a person with Plaintiff's limitations could do. She identified only three unskilled light jobs that such a person could perform, and also testified that if that person had no tolerance for over-the-shoulder supervision, he or she could not "weather the probationary period at any of these jobs." (Tr. 70). It would therefore be nothing more than speculation to conclude that, on this specific record, there are jobs which are within the Plaintiff's capacity to perform, and the Commissioner does not argue otherwise. Although the Commissioner's memorandum advances what have proved to be unsuccessful arguments on the merits of the vocational question, that memorandum argues for remand rather than an immediate award of benefits only because, in the Commissioner's view, there are factual issues to be resolved with respect to the medical evidence. No argument has been advanced that there are factual issues remaining concerning the Plaintiff's inability to tolerate over-the-shoulder supervision or whether such inability precludes a person from successfully completing the probationary period required for the jobs which the vocational expert

identified. *See* Doc. 14 at 15-16.

The absence of factual inconsistencies in the record which, if resolved unfavorably to the Plaintiff, might support a denial of benefits, was the primary reason which led the Court to order a remand for an immediate award of benefits in both *McLaughlin* and *McAfee* (although there were also secondary factors cited in both decisions, including the strength of the evidence concerning disability and the age and procedural history of the cases). To the extent these other factors are present here, the Court notes that the case is more than five years old and that Plaintiff has raised a significant issue concerning the propriety of the ALJ's total rejection of both the treating source and consultative examiner opinions and the way in which the ALJ construed some of the evidence. Further, it is significant to this Court that the ALJ made no effort to have the vocational expert identify other light unskilled jobs which either had no probationary period or had a probationary period which did not involve over-the-shoulder supervision even though that issue was clearly raised by counsel's questioning of the expert. In her decision, the ALJ also acknowledged that "the claimant's representative argued that work was precluded due to possible over-the-shoulder supervision during a probationary period," Tr. 34, so she was aware that this was an issue which needed to be resolved (and, as noted, she purported to resolve it by contradicting her earlier RFC finding and engaging in reasoning that lacked substantial evidentiary support). Many of the cases cited in *Sczepanski* predate the ALJ's decision, so there was also case authority at the time holding that the inability to complete a probationary period precluded a claimant from performing jobs which had such a requirement. The failure properly to resolve the issue added over two years to the life of this case. Taking all of these factors into account, and giving due regard to Judge Newman's rulings in *McLaughlin* and *McAfee*, the Court finds that remand for an award of benefits is the appropriate remedy here.

## V. CONCLUSION AND ORDER

For the reasons stated above, the Court **SUSTAINS** the statement of errors (Doc. 11) and **REMANDS** the case the case to the Commissioner pursuant to 42 U.S.C. §405(g), sentence four, for an immediate award of benefits.

　/s/ **Terence P. Kemp**
**Terence P. Kemp**
**United States Magistrate Judge**